# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### BOWLING GREEN DIVISION

*U S DISTR... FILED*
*WEST...*
*04 JAN 14 PM 3: 56*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel.<br>MARK E. THOMPSON | ) ) | CIVIL ACTION NO. _1:04CV -10-R_ |
| | ) | |
| Plaintiffs, | ) | FILED <u>IN CAMERA</u> |
| | ) | <u>AND UNDER SEAL</u> |
| v. | ) | |
| | ) | |
| QUORUM HEALTH RESOURCES, LLC and<br>TRIAD HOSPITALS, INC. | ) | <u>JURY TRIAL DEMANDED</u> |
| | ) | |
| Defendants | ) | |
| | ) | |

## <u>QUI TAM COMPLAINT</u>

Plaintiff/Relator Mark E. Thompson files this Complaint against Defendants and alleges as follows:

## <u>INTRODUCTION</u>

1.       This is an action to recover damages and civil penalties on behalf of the United States of America arising from false claims or fraudulent claims the Defendants caused to be made to the United States and its agents and intermediaries in violation of the False Claims Act, 31 U.S.C. §3729, *et seq.* (the "FCA").

2.       Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act. The 1986 amendments enhanced the Government's ability to recover losses sustained as a result of fraud against the United States.

3.       The FCA provides that any person who knowingly submits or causes to submit to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty of up to

eleven thousand ($11,000.00) dollars for each such claim, and three times the amount of the damages sustained by the Government.[1] The Act empowers persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The Complaint must be filed under seal, without service on the Defendant. The Complaint remains under seal while the Government conducts an investigation of the allegations in the Complaint and determines whether to join the action.

4.      Pursuant to the Act, the Plaintiff seeks to recover on behalf of the United States damages and civil penalties arising from the scheme to defraud the Government and false or fraudulent and improper charges for payment that Defendants caused to be submitted to the Medicare and Medicaid programs.

## PARTIES

5.      Plaintiff/Relator Mark Thompson ("Thompson") brings this action for violations of the FCA on behalf of himself and the United States pursuant to 31 U.S.C. §3730(b)(1). The Plaintiff has knowledge of the allegations contained in the Complaint.

6.      Plaintiff Thompson is the Chief Executive Officer for Monroe County Medical Center in Tompkinsville, Kentucky, and an employee of Quorum Health Resources, LLC ("QHR").

7.      Defendant Quorum Health Resources, LLC ("QHR"), whose corporate office is located at 5800 Tennyson Parkway, Plano, Texas, 75024, is a company that essentially provides management/administrative services to hospitals. More specifically, QHR provides administrative

---

[1]Under inflationary adjustments implemented in 1999, violations occurring under the FCA after September 29, 1999 are subject to penalties of between $5,500 and $11,000 per violation. 28 U.S.C.A. § 2461 note (2002). 28 C.F.R. § 85.3(9) (2000).

personnel, including but not limited to Chief Executive Officers and Chief Financial Officers, management advisory services, implementation support, education and training programs, consulting and related services to hospitals and health systems.

8.     Defendant Triad Hospitals, Inc. ("Triad"), located at 13455 Noel Road, Suite 2000, Dallas, Texas, 75240, is the parent company that purchased QHR in 2001.  Triad owns numerous hospitals as well as 20% of Healthtrust Purchasing Group (HPG), a Group Purchasing Organization (GPO).

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. §1331 and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §3730.

10.     The Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §3732 (a) which authorizes nationwide service of process and because the Defendants can be found, reside in, and have transacted the business that is the subject matter, in part, of this lawsuit in the Western District of Kentucky.

11.     Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because Defendants can be found, reside in and have transacted the business that is the subject matter of this lawsuit in the Western District of Kentucky.

## BACKGROUND

12.     Medicare is a federally funded health insurance program primarily benefitting the elderly.  Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted and

3

has two parts. Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services. Medicare Part B ("Part B"), the Voluntary Supplemental Insurance Plan, covers the cost of "medical and other health services." *See* 42 CFR §410.26(a). The term "medical and other health services" incorporates services and supplies such as drugs and biologics, which cannot be self-administered and are furnished incident to a physician's professional services. *See* Soc. Sec. Act at §1861(s).

13.     The Medicaid program was created in 1965 in Title XIX of the Social Security Act. Medicaid is a state and federal assistance program to provide medical expenses for low income patients. Funding for Medicaid is shared between the Federal Government and those states that participate in the program with the Federal Government paying approximately one half of Medicaid bills and the State paying the remainder.

14.     The Medicare and Medicaid Fraud and Abuse Statute (the "Statute") was first enacted under the Social Security Act in 1977. The Statute imposes criminal, civil, and administrative penalties on whomever violates the Anti-Kickback Provision and

> offers or pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to purchase, lease order or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a federal healthcare program.

42 U.S.C. §1320a-7b(b)(2)(B).

This prohibition applies to both the buyer and the seller. Additionally, it prohibits the mere act of offering such illegal remuneration, regardless of whether the inducement is ultimately accepted by the buyer. Such inducements are harmful to the Federal Government because they encourage

4

unnecessary treatments, influence the free exercise of medical judgment by providers, limit patient options and lead to higher federal payments for medical services.

## ALLEGATIONS

15.     Federal law prohibits the offering or paying of compensation for the purchasing, recommending or ordering of services, such as supplies and equipment, that are reimbursable under Medicare or Medicaid. *See* 42 U.S.C. §1320a-7b(b).

16.     Since at least May 31st of 2001 QHR has knowingly engaged in a number of fraudulent schemes designed to exploit its fiduciary position and to corruptly manipulate the purchasing decisions of the individual hospitals which it manages (client hospitals), including but not limited to the Monroe County Medical Center, in an attempt to increase corporate profitability to the material detriment of the related patients, client hospitals, competing vendors, and ultimately the United States Government.

17.     Critical to QHR's ability to perpetuate and profit from these schemes, is its capacity to:   (1) fraudulently manipulate the Boards of client hospitals with which it has management/administrative agreements by wrongly using its position as a fiduciary to sway the Boards decisionmaking process relative to vendor agreements; (2) control through various means including, but not limited to, threatening termination, and through the actions of QHR employees who are stationed at the client hospitals whenever these employees attempt to act in the best interest of the client hospital and the patients they serve and adversely affect QHR's ability to carry out such schemes; (3) maintain a level of secrecy which prevents the Boards, Adminstration, and non-QHR

5

employees of the client hospitals, from fully understanding QHR's underlying arrangements which directly result in QHR self-dealing and violations its fiduciary obligations to the client hospital.

18.     These schemes involve QHR corruptly using its fiduciary position to directly or indirectly select, promote, and/or force upon client hospitals certain vendors, while at the same time using various tactics to effectively exclude, demean, defame and/or dissuade the client hospital from selecting other vendors wishing to supply equipment, supplies and/or services to QHR's client hospitals. In the end, QHR is able to use the trust and confidence of the client hospital to manipulate and control vendor selection based on the vendor's financial relationship with QHR, rather than its ability to provide the client hospital with safe and cost-effective equipment, supplies, and/or services. Based upon information and belief these practices have compromised quality and safety in the selection of supplies and equipment.

19.     Through its agents, QHR has devised and implemented what is best described as a "toll road" system whereby the Chief Executive Officers and Chief Financial Officers of client hospitals are encouraged, manipulated, intimidated , and/or forced by threat to only facilitate and promote vendors who pay so-called management fees to QHR or who have other financial relationships with QHR to sell equipment, supplies, and/or services to QHR's client hospitals.

20.     QHR's conduct, as described herein, directly limits the number of vendors available to client hospitals. Further, it discourages vendors that are not involved in the arrangements set forth above from attempting to bid on contracts involving QHR client hospitals as it is reportedly known that the management of QHR client hospitals are pressured to do business only with certain vendors. In other words, many potential vendors understand that QHR managed hospitals are closed to non-toll paying vendors and thus such vendors are unwilling to devote the time and resources necessary

6

to submit bid proposals.  Similarly, when more than one bidder has a relationship with QHR the higher toll-paying bidder is promoted over the others.

21.     These schemes have been, and continue to be, carried out under a variety of different structures, however, in the end, such arrangements were intended to do one or both of the following: (1) result in the client hospital selecting a vendor that is the most financially advantageous to QHR, regardless of the cost, choice or quality impact it has on the client hospital and the patients they serve; and/or (2) result in the client hospital purchasing services that were in whole or part unnecessary, but resulted in direct or indirect financial gain to QHR.

22.     The Health Trust Purchasing Group ("HPG") Arrangement is a group purchasing organization ("GPO") in which QHR's parent corporation, Triad Hospitals, Inc., has a twenty (20%) percent owner ownership interest.  However, unlike traditional GPOs, which attempt to attract business by offering pricing efficiencies based on volume and where participation is voluntary, HPG engages QHR to corruptly influence the purchasing decisions of its client hospitals.  In other words, the selection of HPG vendors by client hospitals is not voluntary but rather expressly or implicitly compelled.  Non-compliance (as it is referred to by QHR) is not well tolerated and exposes the so-called rebellious QHR employee to various forms and degrees of retaliatory conduct by his superiors.  QHR, in return for such strong-arming, receives financial compensation in the form of a percentage of sales from HPG.  This percentage-based compensation is described as an "administrative fee" but, in reality, is a reward for ensuring that client hospitals choose HPG participating vendors.  The local hospital receives a percentage rebate on certain items (normally about one percent of the purchase price) however, the hospital  receives the rebate in a non-itemized lump sum based on purchase category ((e.g.) supplies, equipment and services) and thus cannot accurately determine any given

7

item's actual cost. This, in turn, prevents the client hospital's management from making informed purchasing decisions. Prior to its involvement with HPG, QHR client hospitals had a similar arrangement to participate in a GPO named Premier, for which QHR also received management/administrative fees. However, in July of 2001, client hospitals were forced to change to the HPG GPO based on the fact that HPG was willing to pay a substantially higher management/administrative fee to QHR and Triad would have an ownership interest in HPG, where they had no ownership interest in Premier. Based upon information and belief available, HPG has completed hundreds of millions of dollars in supply sales alone to QHR managed hospitals since January 01, 2002. Further, upon information and belief the total adjusted supply costs have increased by roughly 6.5% at Plaintiff's hospital under the HPG agreement.

23.     Strategic Service Partners (SSPs) agreements are somewhat similar to the HPG arrangements discussed above, except that they do not evolve from a group purchasing organization.[2] Rather, under the Strategic Partnership model, QHR selects and sponsors certain vendors, who are then promoted to client hospitals as the vendor of choice for a certain supply, service, or piece of equipment. However, like the relationships which flow under the HPG model, QHR collects a management/administrative fee under this type of agreement as well. Indeed, the evidence shows that Strategic Partnership vendors will change from time to time and such changes can be traced back to the percentage that a given vendor is willing to pay QHR in the form of a management/administrative fee. The negative effects of such partnership agreements on the local hospitals is essentially the same as those caused by the HPG arrangements, as local hospitals are

---

[2] When Triad first purchased QHR, SSPs were operated in stand-alone arrangements. Recently, it appears that SSPs are operated under a GPO-type structure named Quorum Materials Resource Group (QMRG).

8

railroaded into selecting a strategic partnership vendor over competing vendors regardless of whether or not selecting such a vendor is in the best interests of the hospital and its patients.

24.    American Healthcare Facilities Development, LLC., ("AHFD") is a QHR owned company that provides capital project management services. In a similar mode to the HPG process and the Strategic Partnership agreements discussed above, QHR corruptly influences client hospitals to employ AHFD for capital project planning, management, and partnering for Capital Investment. QHR's promoting and recommending of AHFD to the client hospitals unnecessarily increases the cost of such projects. Such costs generally occur because the hospital pays substantially more for the service than it would if allowed to engage similar vendors in a competitive bidding process. Further, such services are often promoted to the local hospitals in spite of the fact that the project is of such a nature that project management services are not necessary for successful completion of the project.

25.    As a result of the Defendants' pattern and practice of illegally inducing/manipulating the purchasing decisions of its client hospitals, Medicare, Medicaid and other insurers have paid substantially more than they would have absent such illegal inducements.

26.    The Defendants' pattern and practice of illegally inducing/manipulating the purchasing decisions of its client hospitals has resulted in the government paying unlawfully high prices for services, such as supplies and equipment, reimbursed through the Medicaid and Medicare programs.

27.    The Defendants' pattern and practice of illegally inducing/manipulating the purchasing decisions of its client hospitals has lead to an environment wherein issues of quality and patient safety are sacrificed as under-performing vendors are protected by the Defendants and

allowed to continue under contract over the material objections of the administrators and staff of client hospitals.

28.     Furthermore, the Defendants' practices, as described in the paragraphs above, violate a previous Corporate Integrity Agreement stemming from a prior Qui Tam settlement with the government.

**COUNT I**
False Claims Act, 31 U.S.C. §3729(a)(1) & (a)(2)

29.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 26 of this complaint.

30.     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§3729, *et seq.*, as amended.

31.     By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used false records or statements and omitted material facts, to obtain government payment for false and fraudulent claims.

32.     By reason of these payments, the United States has been damages in substantial amounts.

**COUNT II**
False Claims Act, 31 U.S.C. §3729(a)(3)

33.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 30 of this complaint.

34.     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§3729, *et seq.*, as amended.

10

35.     By virtue of the acts described above, Defendants entered into a conspiracy among themselves and with others to defraud the United States by inducing the Government to pay false and fraudulent claims.  Defendants, moreover, took substantial steps in furtherance of the conspiracy *inter alia,* by making false representations, by preparing and submitting false records and by failing to disclose material facts to the Government.

36.     By reason of these payments, the United States has been damaged in substantial amounts.

**WHEREFORE,** Plaintiff/Relator requests that judgment be entered in its favor against Defendants, ordering:

a.      Defendant to cease and desist from violating the False Claims Act, 31 U.S.C. §3729, *et seq.*;

b.      Defendants to pay an amount equal to three times the amount of damages the United States has sustained because of Defendants actions, plus a civil penalty of not less than five thousand ($5,000.00) dollars and not more than ten thousand ($10,000.00) dollars for each violation of 31 U.S.C. §3729;

c.      That Plaintiff/Relator be awarded the maximum amounts allowed pursuant to §3730(b) of the False Claims Act;

d.      That Plaintiff/Relator be awarded all costs of this action, including attorneys' fees and costs; and

e.      That Plaintiff/Relator recover such other relief as the Court deems just and proper.

Respectfully submitted,

R. Kent Westberry
Caroline Pitt Clark
LANDRUM & SHOUSE LLP
220 W. Main St., Suite 1900
Louisville, KY  40202
Counsel for Qui Tam Plaintiff

11

## **REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury.

R. Kent Westberry
Counsel for Qui Tam Plaintiff

## CERTIFICATE OF SERVICE

This is to certify that the original of the foregoing was hand delivered on the 14th day of January, 2004, to:

Office of the Clerk
United States District Court
Louisville Division
106 Gene Snyder U. S. Courthouse
601 W. Broadway
Louisville, KY 40202

It is further certified that a true copy of the foregoing was mailed via U.S. Postal Service on the 14th day of January, 2004, to:

John E. Kuhn, Jr., Esq.
Assistant U.S. Attorney
Civil Division
510 W. Broadway, 10th Fl.
Louisville, KY 40202

R. Kent Westberry
Counsel for Qui Tam Plaintiff